

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

ELIAS LINARES, YVETTE SPADY,
MOSETTA MOREHEAD, and KEITH
CLARK,

                     Plaintiffs,

      -against-

ALPHONSO JACKSON, in his capacity as
the Secretary for the UNITED STATES
DEPARTMENT OF HOUSING & URBAN
DEVELOPMENT, and the UNITED
STATES DEPARTMENT OF HOUSING &
URBAN DEVELOPMENT; and
PRESCIENT, INC.,

                     Defendants.

-------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 06-CV-876 (FB) (KAM)

*Appearances*
*For the Plaintiffs:*
MICHAEL L. WEISBERG, ESQ.
South Brooklyn Legal Services
105 Court Street, 3rd Floor
Brooklyn, NY 11201

*For the Defendants:*
BENTON J. CAMPBELL, ESQ.
United States Attorney
Eastern District of New York
By: ZACHARY A. CUNHA, ESQ.
271 Cadman Plaza East
Brooklyn, NY 11201

**BLOCK, Senior District Judge:**

        The Court is called upon to determine whether the refusal of the defendant

Department of Housing and Urban Development ("HUD")[1] to provide notice and an

opportunity to be heard before initiating eviction proceedings in state court against tenants

in HUD-owned subsidized housing because HUD has determined that the premises are in

---

[1] All references to HUD shall be deemed to include the other named defendants –
Alfonso Jackson, the Secretary of HUD, and Prescient, Inc., a property-management
company acting on HUD's behalf.

need of substantial rehabilitation violates procedural due process. The Court holds that it does; in so holding, the Court declares that a HUD regulation, 24 C.F.R. § 247.10, exempting it from providing notice of this basis for terminating a tenancy is unconstitutional, and sets the case down for a hearing to determine the minimum due process that HUD must afford such tenants before it may seek to evict them from their homes.

## I

At the time of the filing of the complaint, on February 28, 2006, the four plaintiffs were tenants in HUD-owned subsidized housing apartments; HUD had acquired title to these premises – for which it had provided mortgage insurance pursuant to section 203(k) of the National Housing Act (the "NHA"), 12 U.S.C. § 1709(k) – through foreclosures.[2] Three plaintiffs, Keith Clark ("Clark"), Elias Linares ("Linares") and Yvette Spady ("Spady"), had each been served with a notice to vacate their respective homes in order to avoid state eviction proceedings; Clark was given 23 days to move out, Linares and Spady 33.[3] The notices did not state any reasons why the evictions were being sought;

---

[2]Section 203(k) provides, in pertinent part, that "[t]he Secretary [of HUD] may, in order to assist in the rehabilitation of one- to four-family structures used primarily for residential purposes, insure and make commitments to insure rehabilitation loans (including advances made during rehabilitation) made by financial institutions on and after 180 days following October 31, 1978." 12 U.S.C. § 1709(k)(1).

[3]Clark's notice was entitled "Ten Day Notice to Quit Possession of Premises." It was dated February 23, 2005, and required him to vacate on or before March 18, 2005. Linares's notice was dated January 26, 2006, and required him to vacate by February 28, 2006; Spady's notice was dated April 28, 2005, and required her to vacate by May 31, 2005.

Linares's and Spady's simply stated that "the Landlord elect[ed] to terminate [their] tenancy." Clark's notice was somewhat more elaborate, explaining that the building he lived in had been purchased by HUD at a mortgage foreclosure sale some five years earlier and that the judgment of foreclosure provided that "a purchaser at that sale may demand full possession of the entire premises."[4] Plaintiff Mosetta Morehead ("Morehead") had not

---

[4] In its entirety, Clark's notice read:

> PLEASE TAKE NOTICE that The Secretary of Housing and Urban Development ("HUD") is the owner of the premises listed above. The New York State Supreme Court, New York County granted a legal action entitled *M&T Mortgage Corporation v. The Family Preservation Center, Inc.* to foreclose a mortgage. A Judgment of Foreclosure and Sale was duly entered in New York County, which provided, among other things, that a foreclosure sale be held. The judgment also provides that a purchaser at that sale may demand full possession of the entire premises you now occupy . . .

> The premises have been sold at such a sale and the Referee appointed to conduct the sale delivered a proper deed dated March 21, 2001 to The Secretary of Housing and Urban Development, (the "Owner"). A copy of that deed . . . is attached to this notice . . .

> The Owner demands that you VACATE THE PREMISES ON OR BEFORE March 18, 2005 (the "Vacate Date"). You are instructed to deliver possession to the Owner free of all occupants and all your personal property. Do not remove anything attached or used in connection with said premises or covered by the mortgage which was foreclosed.

> TAKE FURTHER NOTICE that unless everyone occupying the premises and all their personal property are removed from the premises on or before the Vacate Date, the Owner will take legal action to evict you under the New

received a notice, but feared that one was imminent because she lived in the same building as Spady.

According to the complaint, each plaintiff was a month-to-month tenant in a multi-family building: Linares' building had six apartments; the other buildings had eight. At the time they received their respective notices, Clark had been living in his home for almost four years, Linares had been in his home for six years and Spady in hers for fourteen years; by the time the complaint was filed, Morehead was a thirty-year resident. Clark's monthly rent was $240, Linares' $650 and Spady's $550.[5]

The complaint sought to enjoin HUD from proceeding with "no cause" evictions. By order to show cause, the plaintiffs also sought preliminary injunctive relief to prevent HUD from effecting such evictions pending resolution of the litigation.

Attached to the order to show cause was a memorandum of understanding (the "MOU") between HUD and New York City's Department of Housing Preservation and Development ("HPD"), dated January 31, 2002, governing the disposition of approximately 514 section 203(k) properties in New York City which HUD "acquired, or anticipate[d] acquiring in the future" as a consequence of failed mortgage loans. MOU ¶2. The MOU states that the circumstances surrounding HUD's acquisition of these properties is "unique," many of the properties are "deteriorated," HUD's capacity to dispose of these

---

York Real Property Actions and Proceedings Law. A court may order a City Marshal, County Sheriff or other enforcement officer to remove you from the Premises.

[5]The complaint did not set forth Morehead's monthly rent.

properties is "overburdened," and "the rehabilitation of these properties will assist the City of New York with its economic recovery from the terrorist attacks of September 11, 2001." *Id.*

The MOU provides that HPD would identify and recommend nonprofit and for-profit developers to HUD. HUD would then sell the properties to the developers and provide, subject to "availability of appropriations," up-front grants for their rehabilitation, MOU ¶ 6; if HUD grants were not available, HPD would provide the funding.[6] According to the MOU, the properties would eventually become, in roughly equivalent numbers, one of three types of housing: (1) affordable rental housing; (2) housing for owner-occupants, without income limitations, with profits above a predesignated amount to be split between the developer and HUD or HPD, depending on which agency provided the funding; and (3) housing for owner-occupants whose incomes do not exceed 165% of the area's median income. *See* MOU ¶4. The MOU approximated that the development cost of the properties would be $167 million, and that their rehabilitation "will create approximately 2,200 dwelling units." *Id.* ¶ 3.1.

HUD opposed the preliminary injunction application by moving to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6), claiming that the dispute was not justiciable and that, substantively, it was not cognizable because HUD was acting within its unfettered discretion. As it tersely explained:

------

[6]According to 24 C.F.R. § 290.27(b), an up-front grant can be available only when, *inter alia*, the developer "[w]ill provide affordable housing for at least 20 years or the term of the loan, whichever is shorter, after the rehabilitation and/or rebuilding is completed."

As set forth in their complaint, as well as the accompanying affidavits of counsel and of three of the four named Plaintiffs, this action challenges the use of so-called "no cause" eviction proceedings against individuals residing in buildings for which HUD previously provided mortgage insurance pursuant to Section 203(k) of the National Housing Act. The buildings in question have since come into HUD's possession as the result of mortgage foreclosures, following a series of fraudulent activities by the original mortgagees. Subsequent to taking possession of a number of properties as a result of the foreclosures, HUD had determined to bundle a number of smaller units together for sale to developers, who will then renovate the buildings for use as low income housing. In so doing, HUD has, at times, and within its lawfully conferred discretion, determined that the rehabilitation of these buildings can best be accomplished by emptying them of their current occupants so that they may be fully rehabilitated and re-let by purchasing developers.

HUD's Memorandum of Law in Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction and in Support of their Cross-Motion to Dismiss ("HUD's MOL") at 3.

In respect to the failure of the notices to set forth the reasons for the evictions, HUD simply argued, without elaboration, that 24 C.F.R. § 247.10 makes inapplicable the process which HUD must undertake whenever it seeks to terminate a tenancy in a multi-family HUD-owned subsidized housing project, including notice of the reasons for such termination, "in any case in which HUD terminates the occupancy of a tenant as a direct result of a determination by HUD to substantially rehabilitate or demolish the project or to dispose of the project to a purchaser who purchases for the purpose of substantial

rehabilitation or demolition." 24 C.F.R. § 247.10; *see* HUD's MOL at 17-18.[7] This was apparently the first time that the three plaintiffs who had received eviction notices learned that HUD believed that it could demand that its tenants vacate their homes – on relatively short notice – without telling them why they were being evicted, if HUD determined that rehabilitation would make the properties more attractive for sale to developers.

On the return date of the preliminary injunction motion, HUD agreed that it would not seek to evict any of the plaintiffs or any other HUD tenant for such rehabilitation purposes, pending resolution of its motion to dismiss, thereby obviating the need for preliminary injunctive relief. *See* Transcript of Order to Show Cause, March 10, 2006.

Oral argument on the motion to dismiss was heard on March 21, 2007. At that time, it was agreed that the claims of two of the plaintiffs, Morehead and Spady, would be withdrawn since they had voluntarily relocated; therefore, they were no longer candidates for eviction. Tr. at 6-7.[8] As for Clark, it was ascertained that a holdover proceeding had indeed been brought against him in New York City Housing Court, but that it was "in a sort of suspended status" pending resolution of HUD's motion. Tr. at 28. As for Linares, HUD "discontinued bringing summary eviction proceedings," Tr. at 30, after the complaint was filed, but the notice to quit was not withdrawn; in any event, HUD

---

[7]Subsequently, a HUD official submitted a declaration which stated that "HUD has determined that summary holdover proceedings are necessary, in some cases, to empty properties in order to facilitate their rehabilitation and/or resale for rehabilitation." Spina Decl. ¶ 8.

[8]"Tr." refers to the transcript of the March 21, 2007 oral argument.

acknowledged that other tenants had received such notices in the past and that it would not represent that it "won't use it in other situations." Tr. at 31.[9]

> During oral argument, HUD made its position on the merits perfectly clear:
>
> THE COURT: * * * If you need the premises for rehabilitation, you don't have to tell them that?
>
> [HUD's COUNSEL]: Exactly.
>
> THE COURT: I don't understand that. Aren't they entitled to know why it is they are being told to leave the premises?
>
> [HUD's COUNSEL]: Because both the U.S. Code provision and the CFR provision, the decision of both Congress and the Agency, has been that when rehabilitation is the issue, then HUD doesn't have to provide notice to the tenant and can use[] this expedited method.

Tr. at 13.

In response to prodding by the Court as to what specific law it was relying on, HUD cited 24 C.F.R. § 247.10, rather than any explicit statutory provision. *See* Tr. at 13-14. Moreover, as detailed in the following colloquy, it acknowledged that it would not be until the tenant was haled into Housing Court, if he or she chose not to vacate, that the tenant would learn the reason for the eviction; nonetheless, in HUD's opinion, the justification for its rehabilitation decision could not be litigated in that court:

> THE COURT: Oh, they've got to go to Housing Court.

---

[9] Clearly the litigation by Clark and Linares is justiciable. *See Escalera v. HUD,* 425 F.2d 853, 865 (2d Cir.), *cert. denied,* 400 U.S. 853 (1970) ("The fact that the HA suspended its procedures to evict the named plaintiffs after the institution of these actions cannot deprive these actions of their controversial nature. The imminence of eviction at the outset of this action provides sufficient controversy.").

[HUD's COUNSEL]: As does any litigant who's been served with a notice of termination. They go into Housing Court and they say, HUD regulations require that there be a reason for the termination. And HUD responds by saying, this is an exempt situation or not an exempt situation. Not an exempt situation then they get the protections of the Housing Court procedures. If it is [not] an exempt situation they have a defense which can be raised and litigated in the Housing Court.

THE COURT: So the first time they're going to find out the reason why they are being evicted from their homes [is] when legal process is served upon them. They have to respond by going to the landlord/tenant court, or the Housing Court. And then, for the very first time, they are going to be finding out the reason why they were told to pack up their bags and find another place to live. And then, at that time, they can perhaps argue before the judge that it is an abuse of discretion - -

[HUD's COUNSEL]: No.

THE COURT: - - to challenge the reason in the Housing Court?

[HUD's COUNSEL]: Not abuse of discretion but for the question of whether or not it's for the purpose of rehabilitation.

THE COURT: How does one get a substantive determination as to whether or not that is a correct determination?

[HUD's COUNSEL]: That is a matter committed by Congress to the Agency's discretion.

\* \* \*

THE COURT: How do they get to the stage where they can say, my place is in perfect condition. I don't see why this has to be rehabilitated. I recognize that you have the right to rehabilitate these premises. I don't think that the plaintiffs are saying that a rat infested place has to remain that way. But, you're wrong here, my place - - come visit me - - it's in perfect shape. I have marble floors, I have Picasso paintings on the wall, everything's perfect. When do they have the opportunity

to say that to HUD?

[HUD's COUNSEL]: They can certainly petition the Agency. But to the extent that the agency has made a determination that this is for rehabilitation, that is committed to the Agency.

THE COURT: So you're saying it's the[] absolute right of the Agency with no effective power of review and no opportunity to be heard, by the person who is losing his or her home. Is that the position?

[HUD's COUNSEL]: We take the position that that is what Congress has determined with respect to this issue.

Tr. 19-21.

When further questioned about the fairness of its position, HUD's counsel acknowledged that it has internal processes to give tenants an opportunity to be heard before they are brought into housing court "in all instances except in the rehabilitation concept," Tr. at 29, and recognized that this matter "highlights a fundamental problem," Tr. at 25.

At the end of oral argument, the parties agreed that HUD's 12(b)(6) motion should be converted into one for summary judgment since the issue of the constitutionality of 24 C.F.R. § 247.10 was a pure question of law; however, they were given the opportunity to make additional submissions. The remaining plaintiffs ("plaintiffs"), Clark and Linares, availed themselves of this opportunity by submitting a Rule 56.1 Statement of Material Facts wherein they stated that there were now "approximately 543 properties in New York City whose owners defaulted on their 203(k) mortgages and are now either owned by HUD or are in the process of being acquired by HUD through foreclosure," and named a number

10

of other tenants who had received "no cause" termination notices.[10]

## II

Congress enacted the NHA in 1934 in order to "encourage improvement in housing standards and conditions, to provide a system of mutual mortgage insurance, and for other purposes." Ch. 847, 48 Stat. 1246. Since then, the scope of the NHA has been expanded numerous times, including the Housing Act of 1949, passed in response to the housing crisis following World War II. *See* ch. 338, 63 Stat. 413. There, Congress declared that the national housing policy was that "the general welfare and security of the Nation and the health and living standards of its people require housing production and related community development sufficient to remedy the serious housing shortage, the elimination of substandard and other inadequate housing through the clearance of slums and blighted areas, and the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family" in order to advance the "growth, wealth, and security of the Nation." 42 U.S.C. § 1441; 12 U.S.C. § 1701t.

As part of the NHA, Congress established a mortgage insurance program to be administered by HUD, and authorized HUD "to make such rules and regulations as may be necessary to carry out" the program. 12 U.S.C. § 1715b. At issue are the regulations comprising Part 247 of Title 24 of the Code of Federal Regulations.

Subpart A of Part 247 governs the termination of tenancies in subsidized

---

[10]HUD countered by protesting that the Rule 56.1 Statement contained extraneous factual matters which were irrelevant to the purely legal question before the Court, and requested an opportunity to submit a counter-statement if the Court deemed any portion of plaintiffs' submission to be relevant.

multi-family housing projects not owned by HUD; Subpart B, by incorporation, makes these provisions applicable to HUD-owned projects "regardless of whether said project was a subsidized project prior to the acquisition of title by HUD." 24 C.F.R. § 247.9. Section 247.3 sets forth four grounds for termination:

> (1) Material noncompliance with the rental agreement,

> (2) Material failure to carry out obligations under any state landlord and tenant act,

> (3) Criminal activity by a covered person in accordance with sections 5.858 and 5.859, or alcohol abuse by a covered person in accordance with section 5.860. . . .

> (4) Other good cause

24 C.F.R. § 247.3(a).[11] This regulation also provides that "[n]o termination shall be valid unless it is in accordance with the provisions of § 247.4," which provides for the following notice of termination:

> The landlord's determination to terminate the tenancy shall be in writing and shall: (1) State that the tenancy is terminated on a date specified therein; (2) *state the reasons for the landlord's action with enough specificity so as to enable the tenant to prepare a defense*; (3) advise the tenant that if he or she remains in the leased unit on the date specified for termination, the landlord may seek to enforce the termination only by bringing a judicial action, at which time the tenant may present a defense; and (4) be served on the tenant in the manner prescribed by paragraph (b) of this section.

24 C.F.R. § 247.4(a) (emphasis added).

---

[11]"Other good cause" is limited to conduct of the tenant of which the tenant has been given "prior notice that said conduct shall henceforth constitute a basis for termination of occupancy." 24 C.F.R. § 247.3(b).

However, all of Part 247 is inapplicable, including this notice provision, where "HUD terminates the occupancy of a tenant as a direct result of *a determination by HUD to substantially rehabilitate*[12] or demolish the project or to dispose of the project to a purchaser who purchases for the purpose of substantial rehabilitation or demolition." 24 C.F.R. § 247.10 (emphasis added).[13]

---

[12]Substantial rehabilitation is not defined in Part 247; however, it is defined in Part 235 – which deals with subsidies for refinanced mortgages – as follows:

> Substantial Rehabilitation means the improvement of a unit in substandard condition to a decent, safe and sanitary level, meeting FHA's standards for mortgage insurance. Units are in substandard condition when, while they may be structurally sound, they do not provide safe and adequate shelter, and in their present condition endanger the health, safety, or well-being of the occupants. Such housing has one or more defects, or a combination of potential defects in sufficient number or extent to require considerable repair or rebuilding, or is of inadequate original construction. The defects are either so critical or so widespread that the structure should be extensively repaired. The estimated cost of the rehabilitation should normally not be less than 25 percent of the value of the property (including land) after rehabilitation. The rehabilitation should be of such scope that, when completed, all the components in the house are operable and should not be anticipated to require any work or major expense over and above normal maintenance for the first one-fourth to one-third of the mortgage term.

24 C.F.R. § 235.1206. Since this was the only definition in existence under the National Housing Act at the time Part 247 was adopted, it is appropriate to apply it to § 247.10. *See Atlantic Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932) ("Undoubtedly, there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning.").

[13]Similarly, Part 247 also does not apply when a non-HUD landlord of subsidized housing "terminates the occupancy of a tenant as a direct result of a determination, concurred in by HUD, to substantially rehabilitate or demolish the project or to dispose

Linares has expressed concern that if evicted, he, his wife and three children will be homeless. *See* Linares Decl. ¶ 16 ("If we are evicted, my family and I have no place else to go."). He may be right. HUD has guarded against the prospects of homelessness if subsidized premises must be temporarily vacated because "there is an immediate threat to the health and safety of the tenants," 24 CFR § 290.7(c); if that be the case, their tenancy is not terminated and HUD must arrange for temporary housing, without cost, while the premises are being repaired, after which the tenants would be entitled to return to their homes. *See* 24 C.F.R. § 290.17(e) (applying to "tenants, who will not be required to move permanently, but who must relocate temporarily (*e.g.*, to permit property repairs)").[14] HUD has also provided for substitute housing under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601 *et seq.* when subsidized

---

of the project to a purchaser who purchases for the purpose of substantial rehabilitation or demolition." 24 C.F.R. § 247.5.

[14]In addition to its own regulations, HUD *qua* landlord is required to act in accordance with state and local law when removing tenants. *See* 24 C.F.R. § 247.6(a) ("A tenant may rely on State or local law governing eviction procedures where such law provides the tenant procedural rights which are in addition to those provided in this subpart."). The New York City Administrative Code grants authority to any government entity with authority to enforce the housing code to "order or cause any dwelling or part thereof which is unfit for human habitation to be vacated," *id.* § 27-2139[b], and requires, *inter alia,* that the order to vacate be served on the tenant; that it "set forth the conditions which render the dwelling or part thereof unfit for human habitation"; and that it give the occupants "not less than twenty-four hours nor more than ten days" to vacate. *Id.* § 27-2140[a]-[b]. Moreover, once the enforcement agency "finds that the conditions rendering a building or part unfit for human habitation have been corrected," *id.* § 27-2142[b], it "may require as a condition for revocation of a vacate order, that the owner make reasonable effort to notify any tenants who may have vacated the dwelling pursuant to such order that said tenant has a right to re-occupy the dwelling." *Id.* § 27-2142[d]. The City Code does not provide for termination of a tenancy under these circumstances.

14

housing tenants are displaced "as a direct result of programs or projects undertaken by a Federal agency or with Federal financial assistance," 42 U.S.C. § 4621(b), such as urban renewal, requiring "conscious government decisions to build a highway here or a housing project or hospital there," in contrast to "random acquisitions by the [government] of defaulted property." *Caramico v. HUD*, 509 F.2d 694, 698-99 (2d Cir. 1974).

However, HUD does not guarantee substitute housing when it decides that premises it has acquired in foreclosure must be permanently vacated in order to make them more attractive to prospective purchasers; instead, it only offers certain advisory services, and payment for moving expenses should the displaced tenant find new affordable housing. *See* 24 C.F.R. § 290.17(c).[15] Moreover, nothing in the MOU obliges

---

[15]Section 290.17(c) provides:

> Whenever the displacement of a residential tenant (family or individual) occurs in connection with the management or disposition of a multifamily housing project . . . (*e.g.*, occurs as a direct result of HUD repair or demolition of all or a part of a HUD-owned multifamily housing project or as a direct result of the foreclosure of a HUD-held mortgage on a multifamily housing project or sale of a HUD-owned project without federal financial assistance), the displaced tenant shall be eligible for the following relocation assistance:
>
> (1) Advance written notice of the expected displacement shall be provided at least 60 days before displacement, describe the assistance and the procedures for obtaining the assistance, and contain the name, address and phone number of an official responsible for providing the assistance;
>
> (2) Other advisory services, as appropriate, including counseling, referrals to suitable (and where appropriate, accessible), decent, safe, and sanitary replacement housing,

HUD or HPD to provide displaced tenants with replacement housing.[16]

## III

Part 247 was originally enacted in 1976 as Part 450, which was similar in all relevant respects except that it did not provide for criminal activity and alcohol abuse as grounds for eviction. *See* Evictions from Certain Subsidized and HUD-Owned Projects, 41 Fed. Reg. 43330, 43332 (Sept. 30, 1976).[17] The stated purpose of its notice provision (then § 450.4) was

> to bring [HUD's] requirements in harmony with an increasing body of judicial opinions that occupancy in a subsidized housing project is in the nature of a welfare entitlement and that tenants in these units are entitled to basic substantive and procedural protections. The right of management to make management decisions without the need to prove its case at an evidentiary hearing must be balanced against the countervailing consideration that *persons receiving the benefits of*

---

> and fair housing-related advisory services;
>
> (3) Payment for actual reasonable moving expenses, as determined by HUD; and
>
> (4) Such other federal, State or local assistance as may be available.

[16]The MOU does, however, state that HPD will "provide, *subject to availability*, section 8 tenant based assistance vouchers from its existing section 8 allocation to qualifying tenants." MOU ¶ 3.6 (emphasis added). The record is silent as to whether Clark or Linares are eligible for section 8 housing, and, if so, whether any HPD vouchers are available. Further, the MOU appears to contemplate relocation of some tenants because in a section discussing the creation of a "package" of properties, one factor to consider is the "[m]ix of vacant and occupied units needed to facilitate relocation during rehabilitation." *Id.* ¶ 6.4.2.

[17]Part 450 was renumbered as Part 247 in 1984, *see* 49 Fed. Reg. 6712, 6713 (Feb. 23, 1984), and in 1996, the criminal and alcohol abuse grounds were added. *See* 61 Fed. Reg. 47380, 47382 (Sept. 6, 1996).

> *subsidized housing not be denied these benefits arbitrarily.*

41 Fed. Reg. at 43331 (emphasis added).

No case discusses § 247.10, and the Federal Register does not shed light on the reason why HUD decided to enact it. Nor does HUD do so now; rather, it simply relies on the general authority conferred upon it by Congress under 12 U.S.C. § 1710(g) that, "[n]otwithstanding any other provision of law relating to the acquisition, handling, or disposal of real property by the United States, [HUD] shall have power to deal with, complete, rent, renovate, modernize, insure, or sell for cash or credit, in [its] discretion, any properties conveyed to [it as a result of a mortgage insurance program.]" 12 U.S.C. § 1710(g); *see* HUD's MOL at 18.

In recognizing that its enactment of the notice provisions in 1976 was in response to "an increasing body of judicial opinions" that tenants in subsidized housing projects were "entitled to substantive and procedural protections," 41 Fed. Reg. at 43331, HUD was undoubtedly aware of the spate of judicial decisions in the circuit courts, especially in the Second Circuit, applying the principle of the Supreme Court's landmark decision in *Goldberg v. Kelly,* 397 U.S. 254 (1970) – that the due process clause applies when the government seeks to discontinue welfare benefits – to the termination of a tenancy in a subsidized housing project. *See Caulder v. Durham Hous. Auth.,* 433 F.2d 998, 1003 (4th Cir. 1970) ("The 'privilege' or the 'right' to occupy publicly subsidized low-rent housing seems to us to be no less entitled to due process protection than entitlement to welfare benefits which were the subject of decision in *Goldberg.*"); *Escalera,* 425 F.2d at 861 (citing *Goldberg* for the proposition that "[t]he government cannot deprive a private citizen of his continued

tenancy, without affording him adequate procedural safeguards even if public housing could be deemed to be a privilege"); *Lopez v. Henry Phipps Plaza South, Inc.*, 498 F.2d 937, 943 (2d Cir. 1974) ("The federal government, the states and the cities which have extended aid to low and middle income housing hardly expected that a tenant could be evicted at the end of his term simply at the landlord's whim, when substitute housing could be obtained, if at all, only with delay, disruption in living habits and expenses."); *Caramico*, 509 F.2d at 701 (tenants in subsidized housing "have a right not to be subjected to treatment both 'covert and arbitrary,' and must be allowed to have an input into the decision to require eviction."); *see also Rudder v. United States*, 226 F.2d 51, 53 (D.C. Cir. 1955) ("The government as a landlord is still the government. It must not act arbitrarily, for, unlike private landlords, it is subject to the requirements of due process of law.").[18]

In *Escalera*, the plaintiffs challenged, under the Due Process Clause, New York City Housing Authority ("NYCHA") procedures for: (1) termination of tenancy on the ground of non-desirability; (2) termination of tenancy for violation of rules and regulations; and (3) assessment of additional rent for "undesirable acts by tenants." 425 F.2d at 857. Relying on *Goldberg*, the Second Circuit found these procedures constitutionally lacking

---

[18]Cases holding that tenants of low income housing are not entitled to due process protections to challenge rent increases, *see, e.g., Reiner v. West Village Associates*, 768 F.2d 31, 34 (2d Cir. 1985); *Langevin v. Chenago Court, Inc.*, 447 F.2d 296, 302 (2d Cir. 1971); *Hahn v. Gottlieb*, 430 F.2d 1243, 1249 (1st Cir. 1970), are inapposite because, as explained in *Hahn*: "Plaintiffs are not legally 'entitled' to low rents in the same sense that the welfare recipient in *Goldberg v. Kelly* . . . was entitled to basic sustenance . . . . Thus the government action in [*Hahn*] pose[d] a less serious threat to the private interest involved than the termination of welfare benefits in *Goldberg v. Kelly* . . . or the eviction in *Escalera* . . . , which as a practical matter meant total loss of decent low-rent housing." 430 F.2d at 1247.

because they did not afford, in each of these three scenarios, effective advance notice of the reasons for the City's actions and a meaningful opportunity to challenge them. In language particularly apropos to the present case, the circuit court gave its approbation to Justice Frankfurter's ringing words in his concurrence in *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 171-72 (1951): "Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." *Escalera*, 425 F.2d at 864.

In *Lopez*, the Second Circuit made clear that in *Escalera* it "required due process hearings although the leases were month-to-month automatic renewable tenancies, terminable by either party at the end of any month upon the giving of one month's notice," agreeing with the Fourth Circuit's decision in *Joy v. Daniels*, 479 F.2d 1236 (4th Cir. 1973) that "the penumbras of the Federal Housing and Development Act and the custom of renewal thereunder [are] sufficient" to create a property interest for due process purposes. *Lopez*, 498 F.2d at 943; *see 9th & 10th Street L.L.C. v. Adopt-A-Building, Inc.* QDS:26703514, N.Y.L.J. Nov. 22, 2000 at 31 (N.Y. Civ. Ct.) ("Continuation of respondents' monthly tenancy for 14 years is one such understanding, custom, or common, prevailing practice governing their landlord-tenant relationship that creates a reasonable basis for tenants to expect that in normal circumstances they will be permitted to remain." (quoting *Joy* and citing *Lopez*; quotation marks omitted)).

In *Caramico*, the Second Circuit precluded mortgagees of premises in low-income areas from complying with an FHA regulation to deliver FHA insured premises

vacant after foreclosure as a precondition for collecting the insurance, without giving the occupants an opportunity to be heard. In so holding, the court acknowledged that "[i]t is normally preferable to have the mortgagee vacate a property so that it may be programmed for repair and exposed to the sales market in the shortest practical time," 509 F.2d at 700; nonetheless, it reasoned that, if given the opportunity, "plaintiffs may be able to show that the housing they occupy is fit for continued habitation and that the repairs required in order to make it salable do not require the property to be vacated." *Id.* at 701. Significantly, the court took note of the consequences of a loss of an abode "in deteriorated, low-income neighborhoods where replacement quarters are not readily available at rents the occupants can afford." *Id.*

It is difficult to fathom why, in the face of this spate of judicial authority, HUD has taken the position, embodied in § 247.10,[19] that by determining that premises it owns are in need of substantial rehabilitation, it can take poor peoples' homes without telling them why and without affording them a meaningful opportunity to be heard. It is beyond cavil that "[a]n essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). Section 247.10 is, simply put, patently unconstitutional.

---

[19]As previously noted, although renumbered in 1984 as Part 247, all of its sections, with the exception of the addition of criminal and alcoholic conduct, are precisely the same as the original Part 450, *see supra* note 17; § 247.10 was then § 450.10.

## IV

It remains to determine the type of notice and hearing which would be "appropriate to the nature" of *this* case. "The minimum procedural safeguards required by due process in each situation depend on the nature of the governmental function involved and the substance of the private interest which is affected by the governmental action," *Escalera*, 425 F.2d at 861, and requires the court to "use the three-factor balancing test articulated in *Matthews v. Eldridge* in deciding whether the demands of the Due Process Clause are satisfied," *Krimstock v. Kelly*, 464 F.3d 246, 253 (2d Cir. 2006): "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Matthews*, 424 U.S. at 335.

It is premature for the court to strike this balance in the present procedural posture of this litigation since the focus has been on the constitutionality of the notice exemption of § 247.10. Consistent with the right to be heard before a decision-maker acts, the parties should be afforded an opportunity to develop the record so that the court can properly consider the full range of their respective interests. *See, e.g., Caulder,* 453 F.2d at 1004 n.3 (remanding where "governmental interests . . . competing with plaintiff's apparent rights have not been developed in the record," so that district court could properly weigh them and "then decide the effect to be given them"). Accordingly, it is provident for the Court to limit its present decision to granting partial summary judgment, declaring § 247.10

unconstitutional, and to set the case down for a hearing to determine the process due when HUD seeks to terminate tenancies"so that they may be fully rehabilitated and re-let by purchasing developers." HUD's MOL at 3.

In doing so, the Court makes the following observations: First, it seems obvious that the process to be afforded should precede the initiation of eviction proceedings. This appears indicated because there is no immediate threat to the tenant's health or safety to warrant summary removal and because of HUD's position that a tenant would not be permitted to challenge the legitimacy of HUD's "substantial rehabilitation" determination in a summary eviction proceeding under New York law. In any event, there is simply no warrant for subjecting a faultless tenant to the cost and burden of the summary eviction process applicable to those who have breached their leases as the price to pay for challenging the legitimacy of HUD's "substantial rehabilitation" decision.

Second, the requisite notice should make it clear why the tenancy is being terminated, as well as the right and process to challenge that decision (to be determined by the Court after the hearing). In that latter regard, the Court is mindful of the salutary purpose of the MOU to encourage the upgrading and sale of HUD's foreclosure housing stock by providing rehabilitation funding for prospective purchasers, and that an evidentiary hearing may not be warranted; however, as HUD itself has acknowledged, "[t]he right of management to make management decisions without the need to prove its case at an evidentiary hearing must be balanced against the countervailing consideration that persons receiving the benefits of subsidized housing not be denied these benefits arbitrarily." 41 Fed. Reg. at 43331. That consideration should require a process to ensure

22

that "substantial rehabilitation" is not arbitrarily being employed as a pretext to evict a tenant from a perfectly decent home in order to sell it to a private developer. *See Escalera*, 425 F.2d at 863 ("Although a full-fledged adversary hearing need not be afforded in all cases, the tenant must be adequately informed of the nature of the evidence against him and accorded an adequate opportunity to rebut the evidence.").

Finally, the Court reemphasizes HUD's admission that the "substantial rehabilitation" notice exemption "highlights a fundamental problem." Tr. at 25. If a building was so in need of substantial rehabilitation that it posed a danger to the health or safety of its occupants, HUD would have to provide for substitute housing while the premises were being repaired, during which period tenants would only be temporarily displaced and not permanently evicted. There is, by contrast, no analogous protection when HUD uses substantial rehabilitation as a means to turn over housing stock to private developers. In other words, while effectuating the MOU may be a legitimate cause for non-renewal of a subsidized housing tenancy,[20] it is somewhat ironic that tenants whose homes fall within the scope of the MOU – even those, like Clark and Linares, who have lived in their houses for many years – do not receive the same protection as low-income tenants whose homes are *truly* in need of rehabilitation. Assurances by HUD that these faultless tenants will not become homeless, either because HUD can undertake substantial rehabilitation without displacing them or because HUD will arrange substitute housing,

---

[20]The Court need not address whether substantial rehabilitation can serve as the basis for evictions prior to the expiration of a lease, as is the case with for-cause evictions under § 247.3, since the evictions here are being sought at the end of plaintiffs' one-month tenancies.

would obviously bear on the Court's *Matthews* analysis, both in terms of the importance of the private interest at stake and the consequences of erroneous deprivations.

## CONCLUSION

The Court grants the remaining plaintiffs' partial summary judgment and declares that 24 C.F.R. § 247.10 is unconstitutional. The case is set down for a hearing at 11 a.m. on January 28, 2008 to afford the parties the opportunity to address the nature and contours of the notice and hearing required by the Due Process Clause.

**SO ORDERED.**

/signed/
_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
January 3, 2008